UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
PATRICIA O'NEIL,
                Plaintiff,

                                                              **MEMORANDUM & ORDER**

   -against-

                                                              09 CV 781 (RJD) (LB)

BANK OF AMERICA,
                Defendant.
------------------------------------------X
DEARIE, Chief Judge.

      Plaintiff Patricia O'Neil[1] brings this employment discrimination action against Bank of America (the Bank) pursuant to Title VII of the Civil Rights Act of 1964, alleging that she was denied equal pay and training and terminated because of her race. She seeks $8,000 in compensatory damages, $8,000 in punitive damages and $2,270 in severance pay. Defendant moves for summary judgment. For the reasons set forth below, the motion is granted, and the complaint is dismissed in its entirety.

## Background

      Plaintiff, a Caucasian woman, was employed by defendant for less than ten months, from December 6, 2006 to September 20, 2007. She was hired as a word processor/administrative assistant in the legal department and was expected to provide support to two litigation attorneys until a permanent litigation administrative assistant could be hired. (Def. Rule 56.1 ¶ 6, 10; O'Neil Dep. at 48.) Plaintiff opened mail, answered phones, handled her assigned attorneys' calendars and schedules, input data into the department litigation database and processed invoices from outside counsel. (Id. at 62-63, 70-71.)

---

[1] Plaintiff initiated this action pro se on February 20, 2009. She did not retain counsel until after defendant filed its Notice of Motion for Summary Judgment on April 12, 2010.

Vicky Cyr was plaintiff's supervisor. (Def. Rule 56.1 ¶ 8; O'Neil Dep. at 44, 48, 61.) She conducted plaintiff's first performance review in January 2007. Because plaintiff had been at the Bank for a short time, however, Cyr's evaluation was limited to noting that plaintiff consistently arrived at work on time. (O'Neil Dep. at 61.) Nonetheless, plaintiff received a $1000 annual raise. (Id.) Plaintiff asked Cyr about additional training in invoice processing, and Cyr advised her that there would be training opportunities throughout the year. (Id. at 106-07.) Until then, she was expected to seek assistance from other department staff, referred to as "knee-to-knee" training. (Id.) Invoice processing instruction was also available during weekly legal department question-and-answer calls. (Id. at 68.) Online instruction was available for using the database. (Id. at 94.) Plaintiff was not aware of the weekly question-and-answer calls until April 2007, however, because her name had not been added to the executive administrative assistant email list. (Id. at 108-109, 113.)

When Cyr left the New York office of the Bank in July 2007, Octavia Saine, an African-American woman, became plaintiff's interim supervisor. (Def. Rule 56.1 ¶ 8; O'Neil Dep. at 94-95.) Saine worked out of the Bank's North Carolina office but visited the New York office two to three times a month. (Def. Rule 56.1 ¶ 9; O'Neil Dep. at 95.) Plaintiff first met Saine at a staff meeting on or around June 25, 2007. (O'Neil Dep. at 97.) At the end of the meeting, she asked Saine whether her position consisted of "executive admin" and "document specialist work." Plaintiff had been hired as an "Admin/Word Processor," but David Grimes, the head of administration for the Bank's legal department, had stopped by plaintiff's desk at some point prior to the staff meeting and asked whether she was "okay" with her position being changed. (Id. at 98-99.) Plaintiff was not aware that there had been any change. (Id. at 98.)

Saine, "without making eye contact" and in a "kind of hostile" manner, replied that plaintiff was mistaken, that the department did not employ document specialists, and that she was an administrative assistant "just like everybody else." (Id. at 99, 101.)

Saine conducted plaintiff's performance review in July of 2007. (Def. Rule 56.1 ¶ 20; O'Neil Dep. at 122.) Her written evaluation of plaintiff was, in part, complimentary, stating that plaintiff was "professional, kind, helpful and calm," had "been creative in overcoming obstacles i.e, [sic] the lack of training in some of the department's programs," had "good skills and [wa]s very capable of providing excellent support to her attorneys," had "willingly share[d] her advance level graphics skills with other admins," was "a self starter and demonstrate[d] good judgment" and was "adaptable to change and . . . willing to take on new responsibilities." (Def. Rule 56.1 at Ex. 6.) Saine's demeanor during the meeting, however, made plaintiff feel like "she was doing a really bad job." (O'Neil Dep. at 129.) Saine "screamed," and "the evaluation was very, very loud." (Id.) Plaintiff "didn't know her well enough to know that that was just her way of expressing herself." (Id.) During the review, Saine told plaintiff that the attorneys for whom she worked "felt that [she] was sitting on their travel and expense requests for too long," and that, as reflected in her written evaluation, she "should be more careful with proofreading." (O'Neil Dep. at 130-31; Def. Rule 56.1 at Ex. 6.) Saine's written evaluation notes also indicate that the attorneys felt that plaintiff missed deadlines because she did "not understand what [wa]s required when given a particular task to complete." (Def. Rule 56.1 at Ex. 6.)

In two separate performance evaluation entries, plaintiff was advised by Saine to contact Maria Barrett to coordinate "formalized training" for the software programs she was required to use. (Id.) Plaintiff herself acknowledged her need for additional training to meet her professional

3

performance goals in her evaluation notes, writing: "I find that further training on Team Connect and Legal Precision will be necessary to obtain this goal . . . . It is my intention to drastically improve my understanding of the invoice process before the 4th quarter by regularly attending weekly departmental conference calls regarding updates to the invoicing process." (Id.)

After her review, plaintiff dialed into the weekly question-and-answer calls, but she never contacted Maria Barrett because she "did not know who Maria Barrett was." (O'Neil Dep. at 135, 137.) She did not understand or write down the name when Saine "screamed" it during the evaluation. (Id. at 129.) Although plaintiff does not recall whether Saine's notes in the evaluation form were complete at the time of their performance meeting, she acknowledges that evaluations were available online for review and that she printed hers but did not look at it. (Id. at 128, 139.)

Sherry Newkirk, an African-American Bank employee, transferred from North Carolina after plaintiff was hired. (Id. at 143.) Saine distributed a training schedule for Newkirk via email with dates and times during which she was expected to meet for specific knee-to-knee training with various individuals, including with plaintiff for intranet training. (Id. at 143; 147-48.) Because Saine distributed the schedule, plaintiff presumes that she was responsible for setting up the training. (Id, at 148-49.) According to plaintiff, Newkirk benefitted from the schedule because her training was "organized" and "people were told specifically you are expected to train Sherry in this particular software." (Id. at 144.) In addition, she was able to meet with individuals from across the street at the Bank's 9 West 57th Street location for training whereas plaintiff was not. (Id. at 145.) The schedule served to inform her superiors that she would be away from her desk. (Id. at 144.) Plaintiff acknowledges, however, that only Newkirk and a

4

group of new employees from the Bank's merger with Bankers Trust received this kind of "specialized training." (Id. at 151-52.)

At the July 2007 performance meeting, plaintiff questioned Saine again about her position and title, specifically asking why she was an Administrative Assistant Level III instead of a Senior Administrative Assistant. (Id. at 156-58.) Saine agreed to change plaintiff's title, but refused to discuss a change in salary in a "hostile" and "abrupt" manner. (Id. at 158, 176, 182.) Both positions fell within the same compensation band, and no one in management told O'Neil that the change in title would be a promotion. (Id. at 163-64, 177.)

Nevertheless, plaintiff asserts that the Senior Administrative Assistant position had a higher pay range of $10,000 to $15,000, and that a document production specialist generally earned $70,000 to $75,000 per year. (O'Neil Dep. at 158; Poole Aff. ¶ 22.) Plaintiff's starting salary was $58,000 per year, but Regina Canto, a Filipino woman who started at the Bank as a legal department Senior Administrative Assistant five months before plaintiff, was hired at a salary of $70,000 per year. (O'Neil Dep at 158-69.) Plaintiff concedes that Saine was not involved in setting her initial salary, and she does not contend that her salary was outside of the applicable range or lower than Canto's because of her race. (Id. at 161-63, 173.) Plaintiff believes, however, that Saine chose not to increase her salary within the range in connection with the title change because Saine had "disdain for white women." (Id. at 173.) Saine was always "cordial" to Canto and Althea Atkins, an African-American woman who worked across from plaintiff, but "there was a definite distinctive change in her tone and her demeanor towards [plaintiff]." (O'Neil Dep. at 174.)

Co-worker Debra Poole and Canto had been friends for fourteen years, and Canto became

an employee of the Bank on Poole's referral. (Poole Aff. ¶ 13.) At the end of the summer, however, the two fought over Canto's alleged refusal to return Poole's apartment keys. (O'Neil Dep. at 184-85; Poole Aff. ¶ 15.) Poole sent an email to Canto "that was considered to be threatening," and Canto reported it to Saine. (Id. at 185.) On September 4, 2007, Saine terminated Poole.

The following day, Saine held an administrative staff meeting to address the Bank's work environment policies and expectations, including "[e]-mail policies and courtesy towards one another, not complaining about who you share your cubicle with" and "not doctoring time sheets." (Id. at 189.) While waving a CD labeled "D. Poole," she said that she was "shocked and appalled" and "disgusted" by the emails she had seen, and without naming Poole, she said that there had been a termination. (Id. at 190.) Saine also announced that she would be conducting an investigation and that she would "eradicate" the "core of evil" in the department with further terminations. (Id. at 190.)

Saine met individually with plaintiff the following day, September 5, 2007. Plaintiff had sent emails to Poole depicting a nude, overweight man; topless women in their bras; and shirtless men. (O'Neil Dep. Ex. 9-11.) In addition, she had responded to an email image of Jesus with the comment "Jesus' vagina?" (O'Neil Dep. at 196; Poole Aff. ¶ 24) Saine told plaintiff that she had seen her emails and was "just disgusted by everything that she saw." (O'Neil Dep. at 197.) She was particularly "incensed" by the "Jesus' vagina?" email that was "offensive to her in a religious aspect." (Id. at 195.) Saine knew that plaintiff was a Sunday school teacher and queried whether plaintiff would want the parents of the children she taught to see the emails that she had on disc. (Id. at 198.) Saine "recommended" that plaintiff find another job immediately

6

and would not consider transferring plaintiff within the Bank, declaring that she was not "Bank of America material" and was "evil." (Id. at 198-99.) In addition, Saine said that she would continue investigating plaintiff "until she found something she could terminate [her] for." (Id. at 202.) Plaintiff, however, was not terminated at that time. (Id. at 201, 210.) Plaintiff took Saine's remark that she was "evil" to mean "blue-eyed devil." (Id. at 288.)

On September 20, 2007, plaintiff was called into the office of one of the attorneys for whom she worked. (Id. at 216.) The Bank's Associate General Counsel was present, and Saine was on the telephone. (Id. at 216-17.) Saine told plaintiff that she was terminated because of "performance issues" and "for signing [an attorney's] name to [an] internal invoice" for payment to outside counsel. (Id. at 217-18.) Plaintiff does not dispute that she signed the July 25, 2007 invoice at issue without the attorney's authorization, but she argues that she signed only in order to expedite processing and believed that the attorney would ultimately have to approve it before it was paid. (Id. at 227, 265.) Plaintiff also admits that sometime in July of 2007, David Onorato, deputy general counsel, sent out an email directive instructing that domestic invoices required an attorney signature for approval. (Id. at 89-90.) Despite this directive, plaintiff viewed her actions as falling within a "gray area." (O'Neil Dep. at 90.) She admits "in retrospect" that signing the invoice "was a bad judgment call." (Id. at 91.) Poole also signed invoices and "believe[d] and underst[ood] that [under] the rules and protocol of the legal department, [she] as well as other legal assistants signed attorneys' names on invoices, which was only the first step in processing invoices for payment." (Poole Aff. ¶ 31.)

Plaintiff "believe[s] [Saine] mentioned the e-mails as well" when firing her. (Id. at 218.) She admits that the emails she sent Poole were not business related or in furtherance of the

7

Bank's interests as required by the Bank's intranet and internet policy, but she asserts that they were "not standouts" and were "the sort of things that were sent back and forth between employees." (O'Neil Dep. at 200-01; 207.) According to Poole, too, "[m]ost employees in the legal department including attorneys and legal administrative supervisors sent e-mails which would likely have been considered as inappropriate e-mails" by the Bank. (Poole Aff. at ¶ 11.) Although Saine reviewed emails from everyone in the department, "[t]he only employees that seemed to be disciplined for it were the tall, blond, blue-eyed women." (O'Neil Dep. 207-08.) According to plaintiff, Sarah Spicehandler was terminated for sending an email with a link to a YouTube video depicting a man setting fire to his pubic hair. (Id. at 211.) Spicehandler, Poole and plaintiff, all Caucasians, "all look very much alike." (Id. at 181.) Maryann Tate, also a Caucasian, was called in around the time of the email investigation to address her "attitude," but she was not fired. (Id. 213-14.) Joanie O'Keefe, who also had blond hair and blue eyes, was terminated for "performance deficiencies" while she was in treatment for multiple sclerosis. (Id. 234-35.)

In further support of her assertion that Caucasians were targeted by Saine, plaintiff references Alex Thomson's email, sent August 26, 2007 at 6:13 a.m. from an outside email account to employees at their Bank email addresses, in which he narrates vacation photos with comments including "[m]y testicles retracted into my body as I sprinted away" from a snake in fear and "I checked to see if my testicles dropped . . . nope!" (Pla. Aff. in Opp'n ¶ 5; Attachment to Goodman Letter dated 9/16/10.) Thomson, an African-American, was not fired. (O'Neil Dep. 211.) Plaintiff also asserts that Canto sent emails with "profanity, derogatory and racist remarks" and "altered her time sheets" but was not terminated. (Id. at 232, 288.) Poole, too, attests that

8

Canto "was chronically tardy, falsified time sheets and was grossly under-skilled for the position that she held." (Poole Aff. ¶ 18.) Plaintiff admits, however, that Canto did not process invoices and did not sign anything for an attorney without authorization. (O'Neil Dep. at 288.) Finally, plaintiff asserts that the "blond-haired, blue-eyed white women" were replaced "with people who were not blond-haired, blue-eyed white women," but admits that she does not know who was in the applicant pool. (Id. at 290.)

## Discussion

I. Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The district court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must then determine whether "a jury might return a verdict in his favor." Id. at 257. "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The non-moving party, however, "may not rely on conclusory allegations or unsubstantiated speculation" in seeking to avoid summary judgment. Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001) (internal citation omitted). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[2]  In Celotex, the Supreme Court squarely rejected the notion that a party seeking summary judgment must "support" its motion "with affidavits or other similar materials negating the opponent's claim," reversing the United States Court of Appeals for the District of Columbia on precisely that ground. Id. at 322. Instead, the moving party's "burden" may be discharged by " informing the district court of the basis for its motion" and "identifying" the portions of the record that it believes demonstrate the fatality in plaintiff's proof.  Id. at 323.  Indeed, even while urging district courts to be "cautious" about granting summary judgment in employment discrimination cases because of the usual absence of "smoking gun" documents or comparable direct evidence of the discriminatory intent on which most cases turn, the Second Circuit nevertheless recognizes that, under Celotex, a defendant is entitled to summary judgment "by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Services, L.P, 22 F.3d 1219, 1224 (2d Cir. 1994).

"One of the principal purposes of the summary judgment rule," according to the Supreme Court, "is to isolate and dispose of factually unsupported claims or defenses."  Celotex, 477 U.S. at 323-24.  Rule 56 requires that, to survive the motion, the non-moving party "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  Thus, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of

---

[2]  The Court is cognizant of the fact that plaintiff retained counsel only after the Bank filed its notice of motion.  Nevertheless, even "a pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat a motion for summary judgment." Jackson v. County of Nassau, 2010 WL 335581, at *5 (E.D.N.Y. Jan. 22, 2010) (citations omitted).

10

summary judgment is proper." Gallo, 22 F.3d at 1224 (emphasis added). "Some metaphysical doubt as to the material facts" is not enough to survive. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

II. Title VII Framework

Title VII of the Civil Rights Act of 1964 "forbids employment discrimination on the basis of 'race, color, religion, sex, or national origin.'" Richardson v. Common on Human Rights and Opportunities, 532 F.3d 114, 119 (2d Cir. 2008) (quoting 42 U.S.C. § 2000e-2(a)(1)). Under the familiar McDonnell Douglas burden-shifting test applicable to discrimination claims, to survive a motion for summary judgment, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, namely: (1) that she belonged to a protected class; (2) that her job performance was satisfactory; (3) that she suffered an adverse employment action; and (4) that the purported adverse employment action occurred under circumstances giving rise to an inference of discrimination. Collins v. New York City Transit Authority, 305 F.3d 113, 118 (2d Cir. 2002) (citing Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir.1999)); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Although the plaintiff's burden at the prima facie stage is minimal, she must provide some competent evidence that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. See Patrick v. New York City Transit Authority, 2007 WL 2071555, at *11 (E.D.N.Y. July 16, 2007) (citing Cronin v. Aetna Life Ins., 46 F.3d 196, 204 (2d Cir. 1995)).

To establish the required fourth element, the plaintiff may produce evidence that her employer criticized her performance in racially degrading terms or made "invidious comments

11

about others in [her] protected group." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). In addition, the sequence of events leading to the plaintiff's discharge or the timing of her discharge may constitute circumstances giving rise to an inference of discrimination. Id. Alternatively, the element is satisfied by a demonstration that the employer treated the plaintiff "less favorably than a similarly situated employee outside [her] protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (citing Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999)); see also Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (citing Graham, 230 F.3d at 39).

"Once a plaintiff has established a prima facie case, the burden of production shifts to the employer to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions." Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999) (citing Fisher v. Vassar College, 114 F.3d 1332, 1335-36 (2d Cir.1997)). The employer's burden is "not a demanding one," as it requires only that the employer offer such an explanation for the employment decision. Id. at 446. "Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with the plaintiff." Id. (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993)). If the employer meets its burden, "the presumption raised by the prima facie case is rebutted, and drops from the case," id. (quoting St. Mary's Honor Center, 509 U.S. at 507) (internal quotations and citations omitted)), and the burden shifts back to the plaintiff to show that the employer's stated reason is a pretext for discrimination. See McDonnell Douglas Corp., 411 U.S. at 806. Plaintiff's admissible evidence must then "show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees

of Columbia University, 131 F. 3d 305, 312 (2d Cir. 1997).

III. Plaintiff's Race Claims

Clearly, plaintiff feels her relationship with Saine was far from ideal. Nevertheless, Title VII "does not set forth 'a general civility code for the American workplace.'" Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998)). Plaintiff's allegations that Saine was hostile, abrupt, and avoided eye contact are broad and conclusory, and they cannot support an inference of discrimination. Indeed, she herself admits that she "didn't know [Saine] well enough to know that [screaming] was just her way of expressing herself." (O'Neil Dep. at 129.)

Plaintiff's attempts to demonstrate that similarly situated non-Caucasian employees were treated more favorably also fall short. To establish disparate treatment, a plaintiff must be "similarly situated" in all material respects to the other employees to whom she compares herself, and those employees must have engaged in comparable conduct for which they were treated differently. Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992)); see also Mazzella v. RCA Global Communications, Inc., 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986) ("[I]n order to be similarly situated, other employees must have . . . engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.") "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." Graham, 230 F.3d at 39. However, "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated

13

prong met." Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (citing, e.g., Cruz v. Coach Stores, 202 F.3d 560, 568 (2d Cir. 2000)).

Putting aside plaintiff's alleged performance issues, no reasonable juror could find that Thomson and Canto were similarly situated to her. First and foremost, neither Thomson nor Canto falsified an attorney signature in violation of the Bank's express policy regarding legal invoices, the conduct for which plaintiff was terminated. Although plaintiff baldly asserts that Canto falsified time sheets, she admits that Canto never signed for an attorney without permission. She does not claim that Thomson falsified documents of any kind.

Understandably, plaintiff places great emphasis on the email investigation that occurred a few weeks before her termination. She admits, however, that even though she violated the Bank's email policy multiple times, she was not terminated for that conduct. Nevertheless, plaintiff attempts to support her claim of disparate treatment with evidence that Poole was fired for her misuse of email. Unlike plaintiff, however, Poole did more than circulate lewd images; she sent a threatening email to Canto. In any case, Poole's termination is not relevant to plaintiff's disparate treatment claim because Poole, like plaintiff, is Caucasian.

Plaintiff's allegation that Saine told her she was "evil" (which plaintiff construes as racially derogatory shorthand for "blue-eyed devil") and would investigate "until she found something she could terminate [her] for," thus stands alone as purported evidence that plaintiff was fired because of her race. (O'Neil Dep. at 198-99, 202). Assuming arguendo that Saine's remarks, standing alone, could give rise to the required prima facie inference of *racial* discrimination, plaintiff nevertheless cannot survive summary judgment because the Bank has satisfied its burden of articulating legitimate nondiscriminatory reasons for firing her, see Reeves

v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (employer's burden to provide nondiscriminatory reasons for plaintiff's termination is "one of production, not persuasion"), and no reasonable juror could conclude that those reasons were a pretext for racial discrimination. The Bank asserts that plaintiff was fired because she falsified an attorney signature on a legal invoice in violation of the Bank's procedures, and because of "performance issues." Plaintiff herself admits having falsified the attorney signature, and further admits that she exercised poor judgment in the workplace during her short tenure. The record also confirms that she chose not to pursue the training opportunities recommended and made available to her to improve her performance and meet her stated goals. Thus, nothing in the record casts doubt on the Bank's non-discriminatory reasons or otherwise supports a finding that those reasons were a pretext for race-based animus.

In sum, plaintiff has failed to come forward with evidence that would permit a rational juror to conclude that her termination was more likely than not based in whole or in part on her race.

Plaintiff has also failed to adduce any evidence whatsoever giving rise to a prima facie inference of discriminatory animus with respect to her unequal pay and unequal training claims. Accordingly, all of plaintiff's claims must be dismissed.

To the extent that plaintiff opposes summary judgment on the ground that the Bank has failed to produce (1) plaintiff's June 1, 2007 response to Poole's email, the "Jesus' vagina email"; (2) the July 2007 email from David Onorato directing that invoices have attorney signatures; (3) seven pages of correspondence between Canto and Poole; (4) Thomson's email referencing his genitalia; and (5) Saine's email containing Newkirk's training schedule, her

15

application is denied.  On June 18, 2010, Magistrate Judge Bloom denied plaintiff's untimely motion, which was filed more than four months after the close of discovery, to compel production of the five documents.  Thomson's email has since been produced and made part of the record before the Court.  Even assuming the contents of the remaining four documents are consistent with plaintiff's allegations, the documents are either irrelevant or would not provide any additional support for plaintiff's claims.

## Conclusion

Defendant's motion for summary judgment is granted with respect to each of plaintiff's claims, and the complaint is dismissed.  The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: Brooklyn, New York
March 31, 2011

s/ Judge Raymond J. Dearie
_____
RAYMOND J. DEARIE
United States District Judge